# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JULIE DILORENZO CARDOSO,

     Plaintiff,

v.                              Case No.: 8:24-cv-2738-KKM-LSG

COMMISIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

The plaintiff Julie DiLorenzo Cardoso appeals the denial of her claim for Social Security Disability Insurance ("SSDI") benefits under Title II of the Social Security Act ("SSA"). Docs. 1, 12. As explained below, I recommend affirming the decision of the Commissioner.

## I.    Procedural background

On June 28, 2012, Cardoso applied for SSDI and alleged that her disability began on September 4, 2009. Tr. 177-78, 193. She later amended her alleged disability onset date to June 12, 2012. Tr. 1894. Cardoso satisfied the insured status requirements of the SSA through December 31, 2014. Tr. 15.

On May 15, 2014, the ALJ denied Cardoso's claim for benefits and found that she was not disabled. Tr. 13-20. She sought review by the Appeals Council, which denied her request. Tr. 1-3. Cardoso appealed the ALJ's decision, and a March 28,

1

2017, order reverses the Commissioner's decision and remands the case for further proceedings after finding that the ALJ failed to appropriately evaluate a treating physician's opinion. Tr. 717-28. On remand, the ALJ found that Cardoso was not disabled. Tr. 625-638. Cardoso appealed, and a September 29, 2021, order grants the Commissioner's unopposed motion to remand for further administrative proceedings. Tr. 1433-1435.

On remand, the Appeals Council directed that a different ALJ receive assignment of the case and that the ALJ obtain additional testimony from a vocational expert. Tr. 1508-1509. The Appeals Council highlighted the "sit/stand option" in the prior ALJ's assessment of Cardoso's residual functional capacity and directed that "[b]efore relying on [vocational expert] testimony the ALJ shall ask the [vocational expert] what her testimony is based on and will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information" in the Dictionary of Occupational Titles and the Selected Characteristics of Occupations. Tr. 1508. The Appeals Council also noted that, because Cardoso had filed a separate application for Title XVI benefits on July 25, 2019, and had been found disabled, the ALJ should consider only the period before that application. Tr. 1509.

On September 15, 2022, Cardoso, a vocational expert, and Dr. Ronald E. Kendrick, M.D., appeared and testified before an ALJ. Tr. 1439-1505. After that hearing, the ALJ found that Cardoso was not disabled. Tr. 1407-1421. Cardoso appealed, and the Commissioner moved unopposed to remand the case for further

2

administrative proceedings. Tr. 1972-73. A July 18, 2023, order grants the motion and directs a judgment in favor of Cardoso. Tr. 1967-68. On remand, the Appeals Council directed the ALJ to (1) evaluate whether Cardoso had chronic pain under Social Security Ruling 03-2p; (2) "[g]ive further consideration to the treating and nontreating source opinions" and "nonexamining source opinion" and "explain the weight given to such opinion evidence"; (3) if warranted, "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base"; and (4) "[t]ake any further action needed to complete the administrative record and issue a decision." Tr. 1895, 1977-79.

On April 11, 2024, another administrative hearing occurred with Cardoso, a vocational expert, and an ALJ. Tr. 1932-64. On July 26, 2024, the ALJ once again found that Cardoso was not disabled through December 31, 2014, the date last insured. Tr. 1894-1920. Cardoso timely appealed, Doc. 1, and the case is ripe for review under 42 U.S.C. § 405(g) and 20 C.F.R. § 404.984(d).[1]

## II.    Factual background and the ALJ's decision

Born in 1968, Cardoso was forty-six years old on her date last insured and forty-four when her alleged disabilities resulting from degenerative disc disease/degenerative joint disease of her thoracic and lumbar spine, Type 2 diabetes mellitus, diabetic polyneuropathy, and obesity began on June 12, 2012. Tr. 1898,

---

[1] Because of the district court's remand, Tr. 1967-68, and because the Appeals Council did not assume jurisdiction, the ALJ's July 26, 2024, constitutes a final decision under 20 C.F.R. § 404.984(d).

3

1919. Cardoso has a high school education, and her occupational history includes work as a probation and parole officer. Tr. 1918-19. Cardoso engaged in no substantial, gainful activity between June 12, 2012, and December 31, 2014. Tr. 1898.

After conducting a hearing and reviewing the evidence, the ALJ determined that Cardoso's impairments are severe but that no impairment or combination of impairments "meets or medically equals" the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 1901-02. The ALJ then concluded that Cardoso has a residual functional capacity to perform "less than the full range of sedentary work," as defined in 20 C.F.R. § 404.1567(a) with the following limits:

> [Cardoso] could occasionally lift or carry 10 pounds; could frequently lift or carry less than 10 pounds; could sit for a period of six (6) hours; stand for a period of two (2) hours; walk for a period of two (2) hours; and push/pull as much as she could lift/carry. She could occasionally operate foot controls on the right and occasionally operate foot controls on the left. Postural limitations would include occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. Environmental limitations would include no exposure to unprotected heights, moving mechanical parts; no exposure to extreme cold, extreme heat; and no exposure to heavy vibration such as the use of a jackhammer or anything similar in nature that would give off heavy vibrations, or heavy machinery. Furthermore, she would require a sit/stand alternative or the ability to alternate positions after a period of 30 minutes.

Tr. 1903. In formulating Cardoso's residual functional capacity, the ALJ considered Cardoso's subjective complaints, as well as a third-party function report submitted by her mother. Tr. 1904, 1917. The ALJ found that Cardoso's medically determinable

4

impairments "could reasonably be expected to cause the alleged symptoms." Tr.
1904. However, the ALJ found that the statements of Cardoso and her mother were
not entirely consistent with the medical and other evidence. Tr. 1904, 1917.
Considering Cardoso's impairments and the testimony of a vocational expert, the
ALJ determined that Cardoso could not perform her past relevant work. Tr. 1918-19.
However, the ALJ found that Cardoso could perform other jobs in the national
economy, including as a food and beverage order clerk, a charge account clerk, or a
call out operator. Tr. 1919-20. Accordingly, based on Cardoso's age, education, work
experience, residual functional capacity, and the testimony of the vocational expert,
the ALJ found Cardoso not disabled. Tr. 1920.

### III.    Standard of review

Entitlement to SSDI benefits requires a "disability," which means the
"inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment" likely to result in death, lasting for at
least twelve months, or expected to last more than twelve months. 42 U.S.C.
§§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" means a
condition resulting from "anatomical, physiological, or psychological
abnormalities . . . demonstrable by medically acceptable clinical and laboratory
diagnostic techniques." 42 U.S.C. §§ 423(d)(3); 1382c(a)(3)(D). To be eligible for
benefits under Title II, a person must demonstrate disability on or before the day for
which the person was last insured. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir.

2005) (per curiam); *see* 42 U.S.C. §§ 416(i)(3), 423(a) & (c); *see* 20 C.F.R. §§ 404.101, 404.130, 404.131.

Social Security Administration ("SSA") regulations establish a five-step "sequential evaluation process" to determine whether a person is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ must determine whether the person (1) is engaged in "substantially gainful activity," (2) has a severe impairment, (3) has a severe impairment that "meets or equals" the medical criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) can perform the person's past relevant work, and (5) can perform other work in the national economy in view of the person's age, education, and work experience. 20 C.F.R. §§ 404.1520(a), 416.920(a). A person may obtain benefits only if unable to perform other work. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

An order affirming the ALJ's opinion is warranted if substantial evidence and applicable law support the decision. 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" means that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Commissioner's factual findings receive deference, but the legal conclusions receive "close scrutiny." *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). A reviewing court may not find facts, weigh evidence, or substitute its judgment for the ALJ's, even if the evidence preponderates against the ALJ's decision. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). However, the Commissioner's failing either to apply the law

correctly or to provide sufficient legal analysis mandates reversal. *Keeton*, 21 F.3d at 1066. Thus, the scope of review is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standard. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

## IV.    ANALYSIS

Cardoso raises three issues on appeal. First, she argues that the ALJ erred by rejecting the opinions of three medical experts about Cardoso's ability to work on a regular and sustained basis. Second, she argues that the ALJ lacked substantial evidence to conclude that Cardoso could perform the sedentary occupations identified by the vocational expert with a "sit/stand" option. Finally, Cardoso argues that because of the extraordinary delay in adjudicating her claim, the completeness of the record, and the uncontroverted evidence of disability, this Court should remand the case for an award of benefits. Doc. 12.

### a.  The ALJ articulated sufficient reasons for rejecting expert medical opinions about Cardoso's working on a regular and sustained basis.

The determination of whether a person is disabled requires assessing the person's residual functional capacity, which is "the most that [the person] can still do despite [the person's] limitations." 20 C.F.R. §§ 404.1520(a), 404.1545(a)(1). In other words, the residual functional capacity is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.]" Social Security Ruling ("SSR") 96-8P, 1996 WL 374184, *1

(S.S.A. Jul. 2, 1996). The SSA defines a "regular and continuing basis" as "8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* As noted by Cardoso, vocational experts in this case testified that missing work more than once or twice a month would preclude competitive employment. Doc. 12 at 6; Tr. 1494, 1920, 1956-1957.

Formulating a person's residual functional capacity requires evaluating medical opinions. The ALJ must consider every medical opinion, 20 C.F.R. § 404.1527(c), but "is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Stolte v. Dudek*, No. 8:24-CV-551-JRK, 2025 WL 925854, at *5 (M.D. Fla. Mar. 27, 2025) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)). The ALJ must, however, "state with particularity the weight given to different medical opinions and the reasons therefor." *Id.*; *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011); 20 C.F.R. § 404.1527(c)(2).

Because Cardoso filed her claim before March 27, 2017, the SSA's former standard for evaluating medical opinion evidence applies here. Under that standard, a treating physician's opinion received greater weight than a non-treating physician's opinion. 20 C.F.R. § 404.1527(c)(1). If the treating source's medical opinion on the nature and severity the impairment was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence" in the record, the treating source's opinion enjoyed "controlling weight." 20 C.F.R. § 404.1527(c)(2); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (explaining that, under the former regulations, "'the

8

testimony of a treating physician must be given substantial or considerable weight
unless 'good cause' is shown to the contrary.'") (quoting *Lewis v. Callahan*, 125 F.3d
1436, 1440 (11th Cir. 1997)). "Good cause" existed when the "(1) treating
physician's opinion was not bolstered by the evidence; (2) evidence supported a
contrary finding; or (3) treating physician's opinion was conclusory or inconsistent
with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241
(11th Cir. 2004). "When electing to disregard the opinion of a treating physician,"
however, the ALJ must clearly articulate the reasons. *Id.* at 1241.

Here, the ALJ considered medical opinion evidence from treating physicians
Dr. Robert Guirguis and Dr. Khalilah Weston and from independent medical expert
Dr. Robert Kendrick. Tr. 1912-1915. Dr. Guirguis completed a "functional capacity
assessment" on March 11, 2014, in which he checked "yes" in response to the
question "[w]ould the patient likely need to miss work on an unscheduled basis."
Tr. 584. Dr. Guirguis checked "3 or more" when asked to estimate how many days
Cardoso would miss each month. Tr. 584. On September 5, 2014, Dr. Guirguis
provided deposition testimony during which he confirmed (1) that Cardoso "has an
unstable back; 'unstable' in terms of we don't know when we're gonna have the flare-
ups"; (2) that "[i]t might be even more than three days, depending on the severity";
and (3) that "we cannot [] have the foresight to see if this is actually going to happen;
but there is – there's enough data looking at these types of – of backs to know that
these flare-ups can certainly occur at different levels of frequencies." Tr. 590-91, 595,
603-604. Similarly, Dr. Weston completed a "medical source statement" on

September 25, 2020, in which she agreed that Cardoso would need to miss work on an unscheduled basis because of her condition. Tr. 1680-81. Dr. Weston checked "3 or more" when asked how many days Cardoso would miss. Tr. 1681.

Consistent with Drs. Guirguis and Weston, Dr. Kendrick testified during the September 15, 2022, administrative hearing that, because of Cardoso's chronic pain, "she would have bad days that she couldn't even show up to work." Tr. 1478. When the ALJ inquired if Dr. Kendrick could determine how often Cardoso's condition would require her to miss work, the following exchange occurred:

> ALJ: And were you able to ascertain or determine, based upon your review of the medical evidence, how often she might have to miss work?
>
> DR. KENDRICK: There's nothing in the medical evidence that shows that, except her testimony and according to the testimony, she has fairly restricted activities, due to her chronic pain, but there's no way to predict it. You'd need a crystal ball. I don't have one of those.
>
> ALJ: Okay, now was there anything, as it relates in your review of the medical evidence, that would support the time off work?
>
> DR. KENDRICK: Nothing other than her testimony.

Tr. 1479. On cross-examination, Dr. Kendrick repeated his opinion that the record lacked sufficient evidence about the frequency of Cardoso's "bad days":

> ATTORNEY: Right and you also testified that you believed that on her worse days, on her bad days, her conditions would prevent her from attending work, correct?
>
> DR. KENDRICK: Correct.
>
> ATTORNEY: But you said you didn't have a crystal ball or a way to predict but Dr. Guirguis, who had treated her for many years, opined that she would miss three days a month and in fact Dr. Weston, her

subsequent pain doctor, said two days a month. Would you agree or defer to their opinions about the frequency that she would be missing work?

DR. KENDRICK: Well, that's their opinion. Everyone is entitled to their opinion. I don't see how they arrive at it, because they don't have a crystal ball either.

ATTORNEY: Does the benefit of having seen somebody for 7 years, more than 75 times, doing the testing, giving medication and whatnot, increase their ability to be able to give an opinion about how often they would have bad days?

DR. KENDRICK: Generally speaking that's true.

Tr. 1486-87.

In other words, the experts agreed that Cardoso could have "flare ups" or "bad days" that would preclude her from working. And both Dr. Guirguis and Dr. Kendrick agreed that the frequency of those days was somewhat, if not totally, unpredictable. Yet Dr. Guirguis gave a prediction and Dr. Kendrick maintained that nothing in the medical evidence supported that prediction. The ALJ afforded Dr. Kendrick's testimony "great weight" and Dr. Guirguis's and Dr. Weston's testimony "little weight." Tr. 1912-14.

In rejecting Dr. Guirguis's opinion, the ALJ acknowledged the physician's general expertise and specific experience in treating Cardoso. The ALJ also agreed that Dr. Guirguis's medical findings were consistent with the assessed limits in Cardoso's functioning. However, the ALJ found that the degree of limitation assessed by Dr. Guirguis lacked support in the medical record. Specifically, as to the amount of missed work, the ALJ "considered Dr. Guirguis's statements regarding

the fluctuating nature of [Cardoso's] symptoms and possible flare ups from even simple movement[.]" Tr. 1914. However, "even Dr. Guirguis's own records do not indicate findings consistent with a flare up limiting [Cardoso] to this severely reduced degree of activity or necessitating frequent absences beyond customary employer tolerances." Tr. 1914.

Cardoso characterizes this conclusion by the ALJ as "nothing more than a lay reading of the examination findings of record" and claims reversible error. Doc. 12 at 12-13. However, the record shows that this was not a "lay reading" of the record, but an interpretation supported by the expert opinion of Dr. Kendrick, who said that the medical record provided no support for three or more unscheduled absences and that he did not see how Dr. Guirguis arrived at that opinion. Tr. 1913-14. According to the ALJ, Dr. Kendrick "specifically considered the likelihood that [Cardoso] would have good and bad days with respect to her pain; however, the medical evidence of record did not support [Cardoso's] testimony that she would experience such fluctuation in her symptoms that she would be unable to perform the reduced range of sedentary work on a regular and consistent basis." Tr. 1912-13. Cardoso calls this "a misrepresentation of Dr. Kendrick's testimony." Doc. 12 at 8 (citing Tr. 1472-82). To the contrary, the ALJ accurately characterized Dr. Kendrick's opinion—yes, Cardoso could have bad days but, in his view, the record contained no evidence supporting the frequency or predictability of those bad days during the relevant period.

12

As for Dr. Weston, the ALJ noted that Cardoso began treating with her in 2016, which was outside of the relevant period and a year and a half after the date last insured. Tr. 1915. The ALJ found that, although Dr. Weston's opinion was consistent with that of Dr. Guirguis, neither the objective examination findings nor the other medical evidence supported limitations to the degree assessed by Dr. Weston. Although Dr. Weston's records show more widespread complaints and notable findings, because these arose only after the date last insured, they would not support greater limits during the relevant period. Tr. 1915. The ALJ found that Dr. Weston's opinion was inconsistent with statements in her treatment records, including Dr. Weston's opinion that, with medication and treatment, Cardoso could return to work. Tr. 1915; *see also* Tr. 1332 ("I informed [Cardoso] that I would not like to see her permanently disabled and do think that with medications or treatment [we] can get her back to working.").

Cardoso argues that the ALJ "failed to consider the impact of [Cardoso's] 'bad days' on [] Cardoso's ability to work on a regular and sustained basis." Doc. 12 at 14. The record shows, however, that the ALJ considered this evidence but found no support in the medical record for this level of restriction during the relevant period. An ALJ can reject a treating physician's opinion based on the lack of supporting evidence within the relevant period, inconsistency with other statements in the record, and evidence supporting a contrary conclusion. *See Phillips*, 357 F.3d at 1241; *see also Hamrick v. Kijakazi*, No. 8:20-CV-2606-TPB-TGW, 2022 WL 4136605, at *10 (M.D. Fla. Aug. 4, 2022) (explaining that "the conclusory check-box format of [the

examining physician's] opinions is, in itself, a recognized basis for discounting the assessment."); *Brown v. Commissioner of Social Security*, 442 Fed. Appx. 507, 512 (11th Cir.2011) (holding that "the ALJ had good cause not to give controlling weight to [the treating physician's] opinion" because they "were conclusory, as the forms . . . regarding [the claimant's] limitations did not reference his treatment records or adequately explain his opinions.").

Here, the ALJ stated with particularity her reasons for rejecting the assessments of Drs. Guirguis and Weston and, in doing so, did not rely impermissibly on her own lay opinion. *See Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1276 n.14 (11th Cir. 2024), *cert. denied sub nom. Raper v. O'Malley*, 145 S. Ct. 984, 220 L. Ed. 2d 362 (2024) ("We emphasize that there are no magic words to state with particularity the weight given to medical opinions or the reasons for discounting them. What matters is whether the ALJ 'state[s] with at least some measure of clarity the grounds for his [or her] decision.'"); *Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1306 (11th Cir. 2018) ("The ALJ's stated reason for discounting Dr. Odjegba's opinion—that it was inconsistent with his own medical records and the record as a whole—was adequate and amounts to good cause."); *Huntley v. Soc. Sec. Admin.*, 683 F. App'x 830, 833 (11th Cir. 2017). Accordingly, I find no error in the ALJ's assessment of the expert opinions as to Cardoso's ability to work on a regular and sustained basis.

### b. The ALJ had substantial evidence to conclude that Cardoso could perform sedentary jobs with a sit/stand option.

Step five of the sequential evaluation requires the ALJ to determine whether the person is capable of performing other work. 20 C.F.R. § 404.1520(g). At this step, the burden shifts to the Commissioner to "provide evidence about the existence of work in the national economy" that the person can do. 20 C.F.R. §§ 404.1512(b)(3), 404.1560(c)(2); *Yuckert*, 482 U.S. at 146 n.5; *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018). "If the SSA makes this showing, 'the burden shifts back to the claimant to prove she is unable to perform the jobs suggested by the [SSA].'" *Washington*, 906 F.3d at 1359 (explaining that "[a]lthough the burden temporarily shifts at step five, "the overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant."). To determine whether a person can perform other work, the ALJ may rely on a vocational expert. 20 C.F.R. § 404.1566(e).

Here, the ALJ determined that Cardoso could perform "less than the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a)," which in part "is defined as one which involves sitting [and] a certain amount of walking and standing." 20 C.F.R. § 404.1567(a); Tr. 1903. "[T]o perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." SSR 96-9P, 1996 WL 374184, *6. The SSA acknowledges that an individual may need to alternate periodically between sitting

and standing or possibly walking. *Id.* at *7. If this need "cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded." *Id.* However:

> The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The [residual functional capacity] assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

*Id.*

The residual functional capacity assessment requires that Cardoso have "a sit/stand alternative or the ability to alternate positions after a period of 30 minutes." Tr. 1903. During the September 15, 2022, administrative hearing at which Dr. Kendrick testified, the ALJ heard from vocational expert Dana Lessne. Tr. 1490-1505. The ALJ explained to Lessne that Cardoso would require a sit/stand alternative or the ability to alternate positions. Tr. 1493. Lessne testified that, although Cardoso could not perform her past relevant work, she could perform work as a document preparer, addresser, or call out operator. Tr. 1494. Lessne testified that his opinion about the sit/stand alternative was based on his "education, experience and training" and noted "that my assumption is that the individual would remain on task." Tr. 1495. The following exchange ensued:

> ALJ: Thank you and yes, that assumption would have remained correct as I was not addressing and I did not indicate that they would be off task while changing positions.

ATTORNEY: Again, I'm sorry, the mask is – I'm having trouble
hearing.

ALJ: I said that the assumption would be correct, as I did not indicate
that they'd be off task while they were changing positions.

ATTORNEY: Okay, I see what you're saying. All right. Because I was
looking at the Appeals Council order and it said if there was a change in
position they'd want to know what the implications would be for that.
So, if you're defining it as would be able to continue persistence and
pace and task –

ALJ: And that is based upon Dr. Kendrick's testimony.

ATTORNEY: Right.

ALJ: Which he had stated that she would be able to do the sit stand
alternative in a 30-minute time frame, without any off task behavior and
be able to remain focused. So, that was part of his testimony today.

ATTORNEY: I recall that, Your Honor, yes ma'am.

ALJ: Okay, thank you. Counsel, did you wish to inquire?

ATTORNEY: I don't have any additional questions.

Tr. 1495-96. On the basis of this and other evidence, the ALJ found Cardoso not

disabled. Tr. 1407-1421. After remand on request of the Commissioner, the Appeals

Council instructed that the ALJ should, if warranted, "obtain supplemental evidence

from a vocational expert to clarify the effect of the assessed limitations on the

claimant's occupational base" and that "[t]he hypothetical questions should reflect

the specific capacity/limitations established by the record as a whole." Tr. 1979.

Vocational expert Gary Fanin testified at the April 11, 2024, administrative

hearing. Tr. 1948. The ALJ inquired with Fanin about the sit/stand alternative or the

ability to alternate positions after thirty minutes. Tr. 1952. Fanin asked whether the

sit/stand alternative would be "consistent," in other words, "[t]hey're up for 30 minutes, sitting for 30 minutes, or is that – is it a random type of scenario"? Tr. 1952.

The ALJ explained:

> ALJ: [W]hat I mean by that is the sit/stand alternative is that they have the ability to hold the position for 30 minutes, but they do not need to have 30 minutes in that position, if that makes sense. So they would be able to sit for a set period of 30 minutes. They could either get up and walk for a couple of minutes or they could get up and walk for 30 minutes before they could go back to sitting and standing for 30.
>
> VE: Okay. So, but you're saying that they're going to leave the workstation?
>
> ALJ: No. I did not say that there was a loss in productivity necessarily.
>
> VE: Okay. That's my question, yes. If there is no loss in productivity when they are standing or sitting.
>
> ALJ: Yes.

Tr. 1952-53. Fanin explained that with a sit/stand alternative or the ability to alternate positions and no loss in productivity, Cardoso could perform work as a food and beverage clerk, a charge account clerk, or a callout operator. Tr. 1953. On further inquiry by the ALJ, Fanin explained that, if a person was off task because of the sit/stand alternative, "that would be work preclusive because then they are not doing their job." Tr. 1958. The ALJ inquired even more precisely and asked whether a person who was off task "for a couple of minutes every thirty minutes" would be able to work. Tr. 1959. In response, Fanin explained "that could be a problem" but "[i]f they can take off task and be at their discretion of when they can take off the two or three minutes or whatever it is, that would be okay[.]" Tr. 1959. The ALJ found

18

Fanin's "vocational testimony to be valid and persuasive," and a reliable basis for determining that Cardoso "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." Tr. 1920.

Cardoso argues that a "sit/stand alternative or the ability to alternate positions after a period of 30 minutes" is "work-preclusive" and inconsistent with the requirements of sedentary work. Doc. 12 at 14-16. Cardoso accuses the ALJ of "cherry-pick[ing]" and "ignor[ing]" as a "mere inconvenience" the vocational expert's testimony "on cross-examination." Doc. 12 at 17. But Cardoso offers no citation to the "cross-examination" that the ALJ purportedly ignored. In fact, all of Fanin's testimony aside from one question (found on Tr. 1960-61) occurred in response to the ALJ's direct examination of the witness, not the attorney's cross-examination. *See generally* Tr. 1948-61.

More importantly, Cardoso fails to identify record evidence showing that the sit/stand alternative would necessarily result in a loss of productivity or time off-task. Dr. Kendrick testified that the sit/stand alternative would not necessarily cause a loss in productivity. Tr. 1479-80. Fanin explained that any problem with the sit/stand alternative depended on whether Cardoso could move at her discretion. Tr. 1959-60. In other words, the evidence before the ALJ showed that the sit/stand alternative would not require Cardoso to be off task and that, as long as she could move at her discretion, jobs existed in the national economy that Cardoso could perform. This satisfied the Commissioner's burden at step five "to determine if there is other work available in significant numbers in the national economy that the claimant can

19

perform." *Washington*, 906 F.3d at 1359. At this point, Cardoso had the burden of

showing that she was unable to perform these jobs, which she failed to do. *See id.*

Accordingly, the ALJ had substantial evidence from which to conclude that jobs

existed in the national economy that Cardoso could perform.

### c. Remand for an award of benefits is unwarranted.

Finally, Cardoso seeks remand for an award of benefits because her 2012

application has been pending for over thirteen years. Cardoso blames the

Commissioner for this delay. Doc. 12 at 21-22. The Commissioner disagrees and

argues that, absent a determination of disability for her 2012 application, Cardoso is

not entitled to an award of benefits. Doc. 16 at 18.

A reversal with a remand is warranted under sentence four of 42 U.S.C.

§ 405(g) if the district court determines that the Commissioner's decision (1) applies

the incorrect law, (2) fails to provide sufficient reasoning to show if the correct law

was applied, or (3) lacks substantial evidence. *Keeton v. Dep't of Health & Human Serv.*,

21 F.3d 1064, 1066 (11th Cir. 1994). However, a district court may reverse the ALJ's

decision and award benefits if the Commissioner "has already considered the

essential evidence and it is clear that the cumulative effect of the evidence establishes

disability without any doubt" or the claimant has suffered an injustice. *Davis v.

Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (citing *Bowen v. Heckler*, 748 F.2d 629,

635-36 (11th Cir. 1984)); *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982). An

ALJ's error and the length of time an application has been pending cannot without

more establish an injustice warranting the immediate award of benefits. *Kropp v.*

*Comm'r of Soc. Sec.*, No. 6:20-CV-1196-RBD-DCI, 2021 WL 2228338, at *3 (M.D. Fla. May 12, 2021).

Although Cardoso endured a lengthy administrative process, the Commissioner's review of the record evidence consistently supports a finding that Cardoso is not disabled. Four administrative hearings occurred. Each of those hearings involved a lengthy review of Cardoso's medical records and supplemental evidence, as well as testimony from Cardoso and several experts. In four decisions the ALJs unequivocally determined that Cardoso was not disabled during the relevant period. As explained above, Cardoso identifies no reversable error in the latest decision by the Commissioner. Thus, despite the procedural delays, Cardoso is not entitled to an immediate award of benefits. *Kropp*, 2021 WL 2228338, at *3.

## V.    CONCLUSION

Accordingly, for the reasons explained above, I recommend affirming the decision of the Commissioner, entering a final judgment in favor of the Commissioner and against Cardoso, terminating any pending motion, and closing the case.

**REPORTED** in Tampa, Florida, on this 16th day of December, 2025.


LINDSAY S. GRIFFIN
United States Magistrate Judge


## NOTICE TO PARTIES

A party has fourteen days from the day of service of this report either to file written objections to the proposed findings and recommendation or to seek an extension of the fourteen-day deadline. 28 U.S.C. § 636(b)(1)(C). Under Eleventh Circuit Rule 3-1, a party failing to object to a magistrate judge's findings or recommendations "waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).  If the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.